LOUISVILLE & N. R. CO. et al. v. WRIGHT, Comptroller General, et al.

(Circuit Court, N. D. Georgia. April 7, 1902.)

No. 1,133.

1. TAXATION—AUTHORITY TO COLLECT DOUBLE TAXES—LEGISLATIVE INTENT.

A purpose to impose double taxation upon property is not to be presumed, but to sustain a tax which would have that effect the legislative intent must be clear and unmistakable.

2. SAME—SHARES OF STOCK IN CORPORATIONS—LAW OF GEORGIA.

Under the constitution and statutes of Georgia, shares of stock owned by citizens of the state in railroad companies, either domestic or foreign, which pay taxes upon their property, are not taxable; nor can authority to collect a tax upon such shares be inferred merely from a

provision in an act levying taxes for a certain year requiring taxpayers to make return of such shares owned by them and their value.

**8. SAME—ILLEGAL TAX—REMEDY BY INJUNCTION.**
　　Under the law of Georgia, where the collection of a tax is attempted without legal authority, injunction is the proper remedy, and such remedy may be enforced by a federal court when the requisite jurisdictional facts exist.

In Equity. Suit for injunction. On final hearing.

Joseph B. & Bryan Cumming and King & Spalding, for complainants.

Boykin Wright and J. M. Terrell, Atty. Gen. of Ga., for defendant.

NEWMAN, District Judge. This is a bill filed by the complainants against William A. Wright, comptroller general, to enjoin the latter from collecting from the Georgia Railroad & Banking Company state taxes on certain shares of stock in the Western Railway of Alabama, complainants being the lessees of the Georgia Railroad, and liable under the terms of the lease for taxes assessed against it. The following stipulation has been entered into by the parties in writing and filed with the record in the case:

"In order to obviate the making of proof in the foregoing case it is agreed between the parties as follows:

"(1) That the citizenship and residence of the several parties plaintiff and defendant are as stated in said bill of complaint, and that the amount in controversy therein involved exceeds the sum of two thousand dollars, exclusive of interest and costs.

"(2) It is agreed that the Georgia Railroad & Banking Company did on the 7th day of May, 1881, enter into a certain indenture of lease with William M. Wadley and assigns, and that a copy of said lease, hereto attached and marked 'Exhibit A,' shall be taken as a true copy thereof, and shall be used and admitted in evidence in lieu of the original.

"(3) It is further agreed that subsequently, on February 2, 1898, by different assignments, the Louisville & Nashville Railroad Company became the sole assign of said lease, and the lessee of said leased property and interests described therein, in lieu of the said Wadley, and was accepted by the Georgia Railroad & Banking Company as such sole lessee, and that it, after being so accepted, deposited one million dollars of securities acceptable to the Georgia Railroad & Banking Company, to secure the faithful performance of said lease according to the covenant made in said lease in respect to the making of such deposit.

"(4) It is further agreed that on or about the ——— day of ———, 1899, the Atlantic Coast Line Railroad Company acquired from the Louisville & Nashville Railroad Company, by assignment, a one-half interest in the said lease, and was accepted by the Georgia Railroad & Banking Company as a co-lessee with said Louisville & Nashville Railroad Company, and that the said Louisville & Nashville Railroad Company and the Atlantic Coast Line Railroad Company are now the co-lessees of said lease, and hold the same as fully and to all intents and purposes as the said William M. Wadley did.

"(5) It is agreed that the Western Railroad of Alabama is a railroad extending from the city of Selma via the city of Montgomery, in the state of Alabama, to the city of West Point, in the state of Georgia, and that all of said railroad except one-fourth of a mile in length lies in the state of Alabama; that the portion of said road lying in the state of Georgia was built in this state by virtue of an act of the general assembly of the state of Georgia passed on the 26th day of December, 1837, incorporating the stockholders of the Montgomery Railroad Company, under the name and style of the Montgomery & West Point Railroad Company, within the corporate

limits of the town of West Point; that this corporation subsequently became the Western Railroad Company of Alabama, and as such owned said railroad, including the part thereof so built under said act of 1837, in the city of West Point, Georgia. It is agreed that said act is a public law of the state of Georgia, and as such to be taken judicial notice of by the courts, and may be referred to as though herein set out, and is to be found in the published acts of 1837, pages 201, 202.

"(6) It is further agreed that all of the property of the Western Railroad Company of Alabama, including the said portion lying in the state of Georgia, was during the year 1875 offered for sale under a foreclosure of mortgage existing thereon, and was sold at judicial sale, and that the said property was purchased by the Georgia Railroad & Banking Company and the Central Railroad & Banking Company of Georgia, two railroad companies of the state of Georgia, under and by virtue of an act of the general assembly of the state of Georgia enacted on the 27th day of February, 1875, and entitled 'An act to authorize and provide for the purchase of the Western Railroad of Alabama, its property and franchises, by the Georgia Railroad & Banking Company and the Central Railroad & Banking Company of Georgia, or either of them, and to authorize said companies to issue bonds in certain cases and to authorize connecting lines to aid in said purchase and issue bonds therefor, and for other purposes,' which said act is published in the Acts of the General Assembly of 1875, pp. 235, 236, and it is agreed it is a public law, and may be referred to as though herein fully set out.

"(7) It is further agreed that said two last-named railroad companies held said Western Railroad of Alabama without incorporating the same, and operated the same as tenants in common, until after the making of the said lease hereto exhibited to William M. Wadley; that on the ——— day of ———, 188—, a charter was applied for under the general laws of the state of Alabama, and a certificate of such charter was issued by the secretary of state for the state of Alabama, in conformity with such laws, incorporating the Western Railway of Alabama, and that to that corporation so incorporated the said Georgia Railroad & Banking Company and the Central Railroad & Banking Company of Georgia conveyed the Western Railroad of Alabama, extending from Selma, Alabama, via Montgomery, to a connection with the Atlanta & West Point Railroad, in the city of West Point, Georgia, and that they received from said new corporation its entire capital stock, to wit, 15,000 shares, of one hundred dollars each, to the Georgia Railroad & Banking Company, and 15,000 like shares to the Central Railroad & Banking Company of Georgia, or a total capital stock of three million dollars, or 30,000 shares of one hundred dollars each; that said railroad company so incorporated is a corporation of the state of Alabama, and owns no property in the state of Georgia except the small portion of railroad hereinbefore set out, which is located in the county of Troup.

"(8) It is further agreed that the 15,000 shares of stock were issued to, and stand in the name of, the Georgia Railroad & Banking Company, but that an irrevocable power of attorney or proxy to vote the same has at all times been issued and existed under said lease in favor of the lessees or assigns, or such person as they might designate to vote said shares.

"(9) It is agreed that the blank annually furnished by the comptroller general to the Georgia Railroad & Banking Company to use in making its tax returns contained, amongst others, the following questions, to wit, 'Number stocks and bonds owned by the company,' and 'Value of all property not enumerated, and value of tools.' That in no other way than in furnishing these blanks did the comptroller general make any demand for taxes upon said shares of stock until about the 25th day of May, 1901, when he specifically demanded of the Georgia Railroad & Banking Company that it pay taxes on said shares of stock for the year 1900 to the state of Georgia, which said taxes so demanded amount to between $7,000 and $8,000. A copy of said blank is attached.

"(10) It is further agreed that it is provided by the terms of said lease that whatever taxes are collectible from said stock during the entire term of said lease Exhibit A are payable by the lessees thereunder, or, if the

same are lawfully collected from said Georgia Railroad & Banking Company, that said lessees are liable to reimburse the same to said Georgia Railroad & Banking Company without in any way diminishing the rental which is payable by said lessees under said lease.

"(11) It is further agreed that stockholders in the Atlanta & West Point Railroad Company, the Georgia Railroad & Banking Company, the Augusta & Savannah Railroad Company, and of all corporations which pay taxes upon their property to the state of Georgia, do not return their shares of stock for taxation.

"(12) It is further agreed that the Code of Alabama shall be admitted without proof."

The foregoing statement of facts, signed by counsel for the respective parties, sufficiently shows all the facts pertinent to the question involved here, which is whether shares of stock in the Western Railway of Alabama, an Alabama corporation, held by the Georgia Railroad & Banking Company, a Georgia corporation, are taxable as property of the latter by the state of Georgia.

One additional fact may be mentioned. It is alleged in the bill, and not denied in the answer, or negatived in any way in the agreed statement of facts, that the Western Railway of Alabama has paid all state and county taxes required of it in the state of Alabama.

It may be conceded, first, as a general proposition, that a state has the power, there being no constitutional inhibition, to treat shares in a corporation as distinct and separate property in the hands of the holders, should it desire to do so for purposes of taxation. This is supported by abundant authority, and is not questioned, as I understand, by counsel for the complainants in this case. Cook, Stock, Stockh. & Corp. Law, § 563; Tennessee v. Whitworth, 117 U. S. 129, 6 Sup. Ct. 645, 29 L. Ed. 830.

Conceding this to be true, however, the real contention of counsel for complainants here is that the state of Georgia has not adopted this policy, and that the action of the comptroller general in attempting to tax these shares is without authority of law.

In endeavoring to ascertain what the law of Georgia is on this subject it may be remarked, first, that there is no express legislation contained in the body of statute laws of this state, either in the Code or subsequent to its adoption, which authorizes the collection of this tax. Reference will be made hereafter to what is contained in the tax act adopted by the legislature of Georgia in 1898, levying taxes for the years 1899 and 1900, under which act the authority to collect the taxes in question here is claimed.

It being true that there is no such express legislation, it will be important to ascertain what the rule or policy of the state otherwise has been, and this seems to be stated in a decision by the supreme court of the state in the case of Wright v. Railroad Co., 64 Ga. 783. In the opinion in that case by Jackson, J., it is said, with reference to an effort of the state to tax the Southwestern Railroad Company, that:

"Stock in the company's own road, held by itself, or in other roads in this state whose charters limit or exempt taxation thereon, and whose income is taxed, is not liable, and stock held by the company in railroads without the limits of this state is not taxable here. Stock in a railroad is really but so many shares of its property, and that property is real estate, for the most part at least, and taxable by the state in which the road is located."

What the court meant to say in the foregoing paragraph is emphasized by the immediately succeeding language, as follows:

"But bonds, notes, and all other mere evidences of debt follow the situs of the creditor, no matter where the debtor lives."

It is said that what has been quoted is a mere dictum, and should not be regarded as authority. There does not appear to be good reason for this claim. The question must have been directly involved, or there would have been no reason whatever for the court to express any opinion on the subject. There must have been an effort on the part of the comptroller general to tax, as a part of the property of the Southwestern Railroad Company, shares held by it in railroads without the limits of the state, in order to have justified any reference to the matter.

It is said, also, that this was a decision on an appeal from the grant of an injunction pendente lite, and was not a final decision in the case. In the concluding paragraph of the opinion this is said:

"The judgment granting the writ of injunction until the hearing is therefore affirmed, and it is ordered that on the hearing the case be tried on its merits, and that such issues be made as shall bring out the whole truth on the facts, and the law as indicated above be applied to those facts, subject to be modified by the chancellor as facts other than those in this record may require."

It is evident from this that the supreme court was stating the law of the case, and that the duty of the court below was to apply that law as thus announced to the facts, which facts, it is indicated, might be subject to modification. No suggestion was made that there might be any change in the law as stated by the court.

It is claimed, however, that the decision above referred to was made under the constitution of 1868, and that according to the decision of the supreme court of the state in Association v. Stewart, 109 Ga. 80, 35 S. E. 73, a distinction is drawn in the rule as to taxation under the constitution of 1868 and that under the constitution of 1877. The first two headnotes of that case are as follows:

"(1) The constitution of 1868 provided that 'taxation on property shall be ad valorem, only, and uniform on all species of property taxed.' As long as that constitution was in force the general assembly had power to exempt one species of property and tax another, and this exemption could be either express, or result from a failure to provide that a given species of property should be taxed.

"(2) The constitution of 1877 provides that 'all taxation shall be uniform upon the same class of subjects, and ad valorem on all property subject to be taxed within the territorial limits of the authority levying the tax, and shall be levied and collected under general laws.' Under this constitution the general assembly cannot lawfully either expressly exempt from taxation, or accomplish this result by a failure to tax any property except that which in the constitution itself the general assembly is expressly authorized to exempt."

What is thus stated in the headnotes, and more elaborately in the opinion, is beside the exact question involved here, which is whether the state, for purposes of taxation, treats the shares in a railroad corporation as property distinct and separate from that of the corporation which it represents. Unquestionably the effect of the decision of the supreme court of the state in Wright v. Railroad Co., supra, is that the

116 F.—43

state does not so regard shares of stock in railroad corporations located without the state. It holds that "stock in a railroad is really but so many shares of its property, and that property is real estate, for the most part at least, and taxable by the state in which the road is located."

Neither do I understand the fourteenth headnote to the opinion in Association v. Stewart to be important or in any way controlling in this case. It is as follows:

"The general assembly has power to levy a tax upon the shares of stock of an incorporated company as the property of the shareholders, and also a tax upon the property of the corporation."

The power, as has been stated, may be conceded; the question is whether the state has exercised it. The following language from the opinion will throw some light upon what, in this respect, was really determined:

"Possibly it may be competent to provide against taxing the shares of stock where all the property which gives them value has been taxed. I do not decide as to this, because it is not before me directly. But in this case the act provides, in terms, not for relieving shareholders against what might be claimed to be double taxation, if the company had paid on everything conferring value on the shares, but, on the contrary, it provides for the company to pay only on the market value, not of its property, but of shares belonging to certain of its stockholders on which no loans have been made. It is exactly a reverse proceeding. Suppose it be true that if all the property which gives shares of stock a valuation has been paid upon, it is equivalent to paying on the shares, and the owners need not pay again, or, at least, that the legislature may provide that they need not pay again; the provision of this act is that if the company will pay on the market value of the shares of some of its stockholders it need not pay on any of its property."

There is nothing whatever in this decision to the effect that the state treats shares of stock in corporations as separate and distinct from that of the corporations for purposes of taxation when the corporation itself is taxed on the property which the shares represent.

It is claimed, however, that the act of the legislature of Georgia levying taxes for the years 1899 and 1900 (Acts 1898, p. 21) by its provisions authorizes and requires the collection of the taxes on the shares in question. In the sixteenth section of this tax act (page 34) it is provided that:

"In addition to the questions now propounded to taxpayers by the tax receivers questions shall be framed by the comptroller general to reach all property upon which a tax is imposed by this act, and especially the following questions."

Certain of these questions are as follows:

"(30) How many shares of stock did you own on the day fixed for the return of property for taxation issued by corporations located without the state?

"(31) What was the gross nominal value thereof?

"(32) What was the fair market value thereof?

"(33) How many shares of stock did you own, on the day fixed for the return of property for taxation, issued by corporations within the state, the capital stock of which or the property of which is not returned by such corporation for taxation?

"(34) What was the gross par value thereof?

"(35) What was the fair market value thereof?"

Are these questions, in effect, such an express legislative enactment as directs a tax levy on shares of the character in question? There should be a reasonably clear expression of legislative intent. Indeed, if this is to be construed as double taxation, the legislative intent should be unmistakable. In Tennessee v. Whitworth, 117 U. S. 129, 6 Sup. Ct. 645, 29 L. Ed. 830, in the opinion by Mr. Chief Justice Waite, it is said:

"In corporations four elements of taxable value are sometimes found: (1) franchises; (2) capital stock in the hands of the corporation; (3) corporate property; and (4) shares of the capital stock in the hands of the individual stockholders. Each of these is, under some circumstances, an appropriate subject of taxation; and it is no doubt within the power of a state, when not restrained by constitutional limitations, to assess taxes upon them in a way to subject the corporation or the stockholders to double taxation. Double taxation is, however, never to be presumed. Justice requires that the burdens of government shall, as far as is practicable, be laid equally on all, and, if property is taxed once in one way, it would ordinarily be wrong to tax it again in another way, when the burden of both taxes falls on the same person. Sometimes tax laws have that effect, but if they do it is because the legislature has unmistakably so enacted. All presumptions are against such an imposition.'

See, also, Desty, Tax'n, p. 199, § 39; Cooley, Tax'n, p. 165.

But whether this be strictly double taxation or not, as it is levied by different states, still there should certainly be a clear legislative expression that railroad shares are property for taxation in Georgia, in view of the distinct utterance by the supreme court to the contrary in Wright v. Railroad Co., supra.

It is admitted by the comptroller general in the agreed statement of facts in this case that "stockholders in the Atlanta & West Point Railroad Company, the Georgia Railroad & Banking Company, the Augusta & Savannah Railroad Company, and all corporations which pay taxes upon their property to the state of Georgia do not return their shares of stock for taxation." Shares of stock owned by citizens of Georgia, in railroads within the state of Georgia, can certainly with as much justice be classed as separate and distinct property in the hands of the holders of such shares as can the shares in railroad corporations without the state of Georgia. It would seem that if the doctrine in the case of Association v. Stewart, supra, is to be applied as contended for, that it would necessarily embrace shares in domestic corporations as well as shares in foreign corporations. If both are property, then, under the construction of the constitution of 1877 announced in that case, both are subject to taxation, neither being expressly exempted by the constitution; and yet it is conceded by counsel for the comptroller general that the state has not attempted to tax shares in domestic corporations, and that it would be wrong for it to do so.

Under the Georgia law, where the tax is sought to be collected without legal authority, an injunction is the proper remedy. Wright v. Railroad Co., 64 Ga. 783–801; Railroad Co. v. Morton, 71 Ga. 24–30; Wright v. Banking Co., 85 Ga. 649, 650, 11 S. E. 1031; Sheibley v. City of Rome, 107 Ga. 384, 33 S. E. 398. The same relief may be granted in the United States court as in a state court if the citizenship is proper.

A part of the agreed statement of facts in this case is as follows:

"It is further agreed that it is provided by the terms of said lease that whatever taxes are collectible from said stock during the entire term of said lease Exhibit A are payable by the lessees thereunder, or, if the same are lawfully collected from said Georgia Railroad & Banking Company, that said lessees are liable to reimburse the same to said Georgia Railroad & Banking Company without in any way diminishing the rental which is payable by said lessees under said lease."

Under the facts stated a case is made for equitable relief, and complainants are entitled to a decree as prayed.